**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UMESH MORSU, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MONTAUK RENEWABLES, INC., SEAN F. MCCLAIN, and KEVIN A. VAN ASDALAN,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Umesh Morsu ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Montauk Renewables, Inc. ("Montauk" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Montauk; and (c) review of other publicly available information concerning Montauk.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Montauk securities between August 5, 2026 and November 9, 2026, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Montauk is a renewable energy company which engages in recovery and processing of biogas from landfills and other non-fossil fuel sources. It has 14 projects across the country, and its facility in Turkey, North Carolina converts swine waste into power, renewable energy credits ("RECs"), biochar, and biocrude.

3. On November 10, 2026, before the market opened, Montauk disclosed it is unable to timely file its upcoming 10-Q "as a result of ongoing negotiations with the lender under the Company's New Senior Credit Facility Agreement." The Company further explained that "***[i]n October 2026, the Company experienced difficulty in meeting certain engineering review and***

***operational requirements in placing its Turkey, North Carolina facility in service***, which has impacted its ability to draw down additional debt under its New Senior Credit Facility."[1]

4. On this news, the Company's share price fell $1.59, or 57.2%, to close at $1.19 per share on November 10, 2026, on unusually heavy trading volume.

5. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Turkey, North Carolina facility was only producing "nominal" levels; (2) that electrical switchgear and feedstock collection were not the only factors limiting commercial production at that facility; (3) that additional factors affected the volume of feedstock conveyed to reactors and the frequency of maintenance intervals; (4) that addressing such limitations required significant capital; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this District.

10. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11. Plaintiff Umesh Morsu, as set forth in the accompanying certification, incorporated by reference herein, purchased Montauk securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12. Defendant Montauk is incorporated under the laws of Delaware with its principal executive offices located in Pittsburgh, Pennsylvania. Montauk's common stock trades on the NASDAQ under the symbol "MNTK."

13. Defendant Sean F. McClain ("McClain") was the Company's Chief Executive Officer ("CEO") at all relevant times.

14. Defendant Kevin A. Van Asdalan ("Van Asdalan") was the Company's Chief Financial Officer ("CFO") at all relevant times until his resignation, effective December 9, 2026.

15. Defendants McClain and Van Asdalan (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

16. Montauk is a renewable energy company which engages in recovery and processing of biogas from landfills and other non-fossil fuel sources.

17. The Company has 14 projects across the country, and its facility in Turkey, North Carolina converts swine waste into power, renewable energy credits ("RECs"), biochar, and biocrude. The Turkey, North Carolina facility represents a $200 million capital investment.

### Materially False and Misleading

### Statements Issued During the Class Period

18. The Class Period begins on August 5, 2026. On that day, Montauk issued a press release announcing its financial results for the quarter ended June 30, 2026. The press release touted the Company's alleged financial results, and further alleged "***[i]n July 2026, we began***

***generating power for sale from our Turkey, North Carolina facility***." Specifically, the press release stated as follows, in relevant part:

> Second Quarter Highlights:
>
> • Revenues of $54.0 million, increased 19.7 % year-over-year
>
> • Net income of $0.2 million, increased 104.1% year-over-year
>
> • Non-GAAP Adjusted EBITDA of $12.3 million, increased 144.5% year-over-year
>
> • RNG production of 1.5 million MMBtu, increased 3% year-over-year
>
> • RINs from operations sold of 14.3 million, increased 29.1% year-over-year
>
> ***In July 2026, we began generating power for sale from our Turkey, North Carolina facility.*** This production of power is expected to be eligible to generate both swine RECs [i.e., renewable energy credits] and enhanced RECs in subsequent months. ***As we work to increase the volumes of power and RECs that are able to be generated from our volume of produced syngas, we have identified specific programming modifications to our installed electrical switchgear.*** The installation of these modifications will provide for both the increase in production volumes as well as enhance protection of our processing equipment and electrical transformers. We expect to have all programming completed by mid-August and consistently generate power and RECs from all available collected feedstock volumes.
>
> We continue to progress with our installation of feedstock collection at our targeted 400 thousand to 450 thousand hog spaces. As of the end of July, we have entered into long term agreements with over fifty separate farming locations providing us access to at least 350 thousand hog spaces. We are currently able to collect from more than 250 thousand hog spaces and will continue farm site collection equipment installations during the second half of 2026.

19. On August 5, 2026, the Company submitted its quarterly report for the period ended June 30, 2026 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report stated the following regarding the Company's Turkey, North Carolina facility, in relevant part:

> ***In July 2026, we began generating power for sale from our Turkey, North Carolina facility. This production of power is expected to be eligible to generate both swine RECs and enhanced RECs in subsequent months.*** As we work to increase the volumes of power and RECs that are able to be generated from our volume of produced syngas, we have identified specific programming modifications to our installed electrical switchgear. The installation of these

> modifications will provide for both the increase in production volumes and enhanced protection of our processing equipment and electrical transformers. We expect to have all programming completed by mid-August and consistently generate power and RECs from all available collected feedstock volumes.
>
> We continue to progress with our installation of feedstock collection at our targeted 400 to 450 hog spaces. As of the end of July, we have entered into long term agreements with over fifty separate farming locations providing us access to at least 350 hog spaces. We are currently able to collect from more than 250 hog spaces and will continue farm site collection equipment installations during the second half of 2026.
>
> ***Our capital investment expectation for this first phase of the project remains unchanged at $200,000. We continue to expect a ramp-up in production volumes throughout 2026 directly related to additional feedstock collection.***

20. The above statements identified in ¶¶18-19 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Turkey, North Carolina facility was only producing "nominal" levels; (2) that electrical switchgear and feedstock collection were not the only factors limiting commercial production at that facility; (3) that additional factors affected the volume of feedstock conveyed to reactors and the frequency of maintenance intervals; (4) that addressing such limitations required significant capital; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

21. On November 10, 2026, before the market opened, Montauk disclosed it is unable to timely file its upcoming 10-Q "as a result of ongoing negotiations with the lender under the Company's New Senior Credit Facility Agreement." The Company further explained that "***[i]n October 2026, the Company experienced difficulty in meeting certain engineering review and operational requirements in placing its Turkey, North Carolina facility in service***, which has impacted its ability to draw down additional debt under its New Senior Credit Facility."

Specifically, the Company filed a Form NT 10-Q with the SEC which stated as follows, in relevant part:

> Montauk Renewables, Inc. (the "Company") is unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the period ended September 30, 2026 ("Q3 Form 10-Q") within the prescribed timeframe as a result of ongoing negotiations with the lender under the Company's New Senior Credit Facility Agreement ("New Senior Credit Facility"). In October 2026, the Company experienced difficulty in meeting certain engineering review and operational requirements in placing its Turkey, North Carolina facility in service, which has impacted its ability to draw down additional debt under its New Senior Credit Facility. As a result, the Company is engaged in discussions with the lender of the New Senior Credit Facility to renegotiate the terms of the New Senior Credit Facility, including obtaining an amendment to borrow additional debt and temporarily forbear and standstill certain debt covenant requirements, and are in discussions with its Board of Directors on potential additional shareholder financing dedicated to the development of the Turkey, North Carolina facility. There can be no assurance that the Company will be successful in obtaining relief under its New Senior Credit Facility or in raising any additional financing.

22. On this news, the Company's share price fell $1.59, or 57.2%, to close at $1.19 per share on November 10, 2026, on unusually heavy trading volume.

23. Then, on November 16, 2026, before the market opened, Montauk announced its third quarter 2026 financial results in a press release. It provided additional information about the operational delays, stating in relevant part:

> In July 2026, we began generating power for sale from our Turkey, North Carolina facility and continued to generate power, RECs, biochar and biocrude at ***nominal levels*** throughout the third quarter of 2026. In August 2026, we received notice from our power purchase utility that the facility had received notice of commercial operation date. Our production of power and notice from the utility permitted us to generate both swine RECs and enhanced RECs in subsequent months. We identified specific programming modifications to our installed electrical switchgear which was completed during the third quarter of 2026. ***Also during our operations during the third quarter of 2026, we identified enhancements to address two specific concerns limiting the commercial production volumes of the facility, those being the moisture control of our inlet feedstock and the preservation of syngas temperature from our reactors to our compression and power generation.*** These concerns reduce the volume of feedstock that can be conveyed to our reactors, and increase the frequency of maintenance intervals to address the consequences of gas separation through the facility due to premature temperature loss. ***We anticipate these enhancements to take approximately three months to complete from the***

> ***placement of componentry orders, and cost approximately $15.0 million.*** We expect to commence these enhancement projects immediately upon execution of the amendment to our New Senior Credit Facility.

24. Also on November 16, 2026, Montauk filed a Form 8-K with the SEC stating that Defendant Van Asdalan had provided notice of resignation, effective December 9, 2026.

25. Also on November 16, 2026, Montauk filed its Form 10-Q for the period ended September 30, 2026, revealing that it had executed a non-binding term sheet with its lender to temporarily forbear and standstill certain debt covenant requirements under its credit facility, without which the Company would lack sufficient liquidity to fund operations for the next twelve months. Specifically, the Company stated:

> We are in compliance with the financial covenants under our New Senior Credit Facility as of September 30, 2026. We have, and are likely to continue to experience difficulty in meeting certain engineering review and operational requirements in placing our Turkey, North Carolina facility in service, which has impacted our ability to draw down additional debt under our New Senior Credit Facility. Delays in drawing down additional debt, the level of the Company's current obligations, and the Company's continuing capital requirements have adversely affected the Company's liquidity outlook. We have executed a non-binding term sheet with the Lender of our New Senior Credit Facility for an amendment to borrow additional debt and temporarily forbear and standstill certain debt covenant requirements, as without such an amendment we believe it is probable we will not have sufficient liquidity to fund our operations and meet our existing debt covenant requirements through the twelve months following the issuance of these financials. If we are unsuccessful in obtaining relief from the Lender under our New Senior Credit Facility, we expect to be in default of the covenants thereunder as of December 31, 2026. Accordingly, these conditions and events, considered in the aggregate, initially raised substantial doubt about the Company's ability to continue as a going concern.
>
> Based on the continued engagement with the Lender and the executed non-binding term sheet for an amendment to our New Senior Credit Facility, and based on discussions with our Board on potential additional shareholder financing dedicated to the development of our Turkey, North Carolina facility, we expect to be successful in obtaining an amendment to our New Senior Credit Facility to forbear and standstill certain debt covenant requirements for a period of twelve months for future debt covenant requirements and borrow additional debt under our New Senior Credit Facility and receive additional shareholder financing. In addition to pursuing an amendment under our New Senior Credit Facility and the shareholder financing noted above, other potential plans available to us also include limiting

> development and discretionary capital expenditures, prioritizing expenditures needed to support existing operations and revenue generation, negotiating payment arrangements with certain vendors and evaluating other liquidity and restructuring alternatives including potential asset sales under the amendment being negotiated. Based on management's evaluation of these plans, including its assessment that the plans are probable of being effectively implemented and, when implemented, probable of mitigating the conditions described above, management concluded that these plans alleviate the substantial doubt regarding the Company's ability to continue as a going concern for the one-year period following the date these financial statements are issued.
>
> Notwithstanding the above, there can be no assurance that the Company will successfully obtain an amendment to our New Senior Credit Facility to waive financial covenant requirements and borrow additional debt, raise additional capital through other funding sources or generate sufficient cash flows from operations to sustain operations and fund necessary expenditures within the year following the date of the issuance of these consolidated financial statements. These condensed consolidated financial statements do not include any adjustments that might result from the outcome of these uncertainties.

## CLASS ACTION ALLEGATIONS

26. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Montauk securities between August 5, 2026 and November 9, 2026, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

27. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Montauk's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Montauk shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be

identified from records maintained by Montauk or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

29. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

30. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Montauk; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

31. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

32. The market for Montauk's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Montauk's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Montauk's securities relying upon the integrity of the market price of the Company's securities and market information relating to Montauk, and have been damaged thereby.

33. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Montauk's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Montauk's business, operations, and prospects as alleged herein.

34. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Montauk's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

35. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

36. During the Class Period, Plaintiff and the Class purchased Montauk's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

37. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Montauk, their control over, and/or receipt and/or modification of Montauk's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Montauk, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

38. The market for Montauk's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Montauk's securities traded at artificially inflated prices during the Class Period. On

September 29, 2026, the Company's share price closed at a Class Period high of $2.94 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Montauk's securities and market information relating to Montauk, and have been damaged thereby.

39. During the Class Period, the artificial inflation of Montauk's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Montauk's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Montauk and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

40. At all relevant times, the market for Montauk's securities was an efficient market for the following reasons, among others:

(a) Montauk shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Montauk filed periodic public reports with the SEC and/or the NASDAQ;

(c) Montauk regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Montauk was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

41. As a result of the foregoing, the market for Montauk's securities promptly digested current information regarding Montauk from all publicly available sources and reflected such information in Montauk's share price. Under these circumstances, all purchasers of Montauk's securities during the Class Period suffered similar injury through their purchase of Montauk's securities at artificially inflated prices and a presumption of reliance applies.

42. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

43. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Montauk who knew that the statement was false when made.

## FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

**Against All Defendants**

44. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

45. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Montauk's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

46. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Montauk's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

47. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Montauk's financial well-being and prospects, as specified herein.

48. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Montauk's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Montauk and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

49. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management

team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

50. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Montauk's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

51. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Montauk's securities was artificially inflated during the Class Period. In ignorance of the fact that

market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Montauk's securities during the Class Period at artificially high prices and were damaged thereby.

52. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Montauk was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Montauk securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

53. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

54. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of The Exchange Act**

**Against the Individual Defendants**

55. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

56. Individual Defendants acted as controlling persons of Montauk within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

57. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

58. As set forth above, Montauk and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 24, 2026

By: *s/ James M. Ficaro*

**THE WEISER LAW FIRM, P.C.**
James Ficaro (PA ID 308198)
Four Tower Bridge
200 Barr Harbor Dr.
West Conshohocken, PA 19428
Tel: 610.225.0206
Fax: 610.408.8062

**GLANCY PRONGAY WOLKE & ROTTER LLP**
Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: (310) 201-9150
Fax: (310) 201-9160
rprongay@glancylaw.com
clinehan@glancylaw.com
prajesh@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Los Angeles, CA 90067
Tel: (310) 914-5007

*Counsel for Plaintiff*